**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No.: 24-CR-140-JAW |
| | : | |
| v. | : | |
| | : | |
| YONGLIANG DENG, a/k/a | : | |
| DAVID DENG | : | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

**NOW COMES** Defendant,Yongliang Deng, a/k/a David Deng (hereinafter "Mr. Deng"), by and through undersigned counsel, and hereby provides the Court with the following memorandum in aid of sentencing.

## *I. Background*

On December 11, 2024, Mr. Deng was charged by indictment with Bank Fraud Conspiracy (Count One), Bank Fraud (Count Five) and False Statements Made to Federal Law Enforcement Agents (Count Fourteen). *See* ECF at #3. Mr. Deng was arrested and made his initial appearance in the Eastern District of New York on December 12, 2024. *See United States of America v. Yongliang Deng, a/k/a David Deng*, 1:24-mj-00655-MMH. Mr. Deng was ordered released and has remained in that status ever since (more than eighteen months) without incident. *See Id.* at 2; *see also* ECF at #31 & PSR at ¶6 (stating "[o]n May 12, 2026, the defendant's Eastern District of New York pretrial supervision officer advised the defendant was doing well on supervision and there were no violations to report").

On January 21, 2026, Mr. Deng changed his plea and pled guilty to Count One of the Indictment. *See* ECF at #83. Pursuant to a written plea agreement, the government has agreed to move to dismiss Counts Five and Fourteen of the Indictment pursuant to Fed. R. Crim. P. 11(c)(1)(A) at the time of sentencing. *Id.* at #64.

On March 12, 2026, the United States Probation and Pretrial Services Office (hereinafter sometimes "Probation") provided the parties with its initial Presentence Report ("PSR"). *Id.* at #91. Mr. Deng objected to the initial PSR arguing, among other things, that he should not receive a ten-level enhancement pursuant to United States Sentencing Guideline ("USSG") §2B1.1(b)(1)(F) since there was no "intended loss" in the case[1], that he should receive a reduction for "minor role" pursuant to USSG §3B1.2(a)-(b) and that, insofar as there is no actual, current loss to Kennebec Savings Bank (*See* PSR at ¶15), he should not be subject to an order of restitution.

The revised PSR determined that the specific offense characteristic for intended loss was appropriate and applied the ten-level enhancement and that Mr. Deng should not receive an adjustment for "minor role". *Id.* at ## 21 & 23. Finally,

---

[1] Mr. Deng further objected that even if a specific offense characteristic enhancement for loss is applied, it should be an 8 level enhancement, not a 10 level enhancement insofar as the United States Sentencing Commission on April 16, 2026, voted to promulgate an amendment to United States Sentencing Guidelines §§2B1.1(b)(1)(E)&(F) making a loss of more than $150,000 but less than $200,000 susceptible to an 8 level enhancement, not 10. *See* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202604_prelim-RF.pdf

the revised PSR found, while noting the Mr. Deng's objection (*Id.* at ¶61A), that restitution should be ordered. *Id.* at ¶¶ 60 & 61.

On June 11, 2026, the Court conducted a Presentence Conference and asked the parties to brief these issues[2]. *Id.* at #111. Mr. Deng does so here and respectfully asks that the Court find that he should not receive an enhancement for loss, that he should receive a "minor role" adjustment and that he should not be ordered to pay restitution.

## *II. Argument*

### A. Mr. Deng Should not Receive a Sentencing Enhancement for Actual or Intended Loss.

Mr. Deng is not subject to a sentencing enhancement for actual or intended loss under USSG §2B1.1(b)(1) because the bank did not lose any money and Mr. Deng did not intend for the bank to lose any money.

In the first instance, the government bears the "burden of establishing the applicability of an enhancement". *United States v. Gordon*, No. 15-2395, 2017 WL 1164364, at *5 (1st Cir. March 29, 2017); *citing United States v. Alphas*, 785 F.3d 775, 784 (1st Cir. 2015). "[T]he government must prove the enhancement[] ... by a preponderance of the evidence." *United States v. Bishoff*, 58 F.4th 18, 23 (1st Cir. 2023); *citing United States v. Ilarraza*, 963 F.3d 1, 7-8 (1st Cir. 2020).

---

[2] Only the legal issues raised through the objections to the PSR are addressed here. The defense reserves it right to submit a brief, supplemental sentencing memorandum addressing, in particular, the 18 U.S.C. § 3553(a) factors prior to the August 24, 2026 sentencing hearing consistent with U.S. District Court for the District of Maine Local Rule 132(g).

The Sentencing Guidelines state that the offense level under Section 2B1.1 increases if the actual or intended loss exceeds $6,500. USSG §2B1.1(b)(1)(B). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." §2B1.1(b)(1)(C)(i). In this case, there is no alleged actual loss because the 2025 tax assessment for the Eddington property indicates that the value of the property is significantly greater than the amount owed on the mortgage (PSR ¶13), and the Guidelines dictate that the fair market value of the collateral pledged at the time of sentencing shall be credited against any loss. §2B1.1 app. n.3(D)(ii).

Meanwhile, "intended loss" is explained as "the pecuniary harm that the defendant purposely sought to inflict." §2B1.1(b)(1)(C)(ii). As the PSR aptly references, intended loss "includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* Critically, however, the examples of impossible or unlikely pecuniary harm given by the Guidelines indicate that such harm is distinct from the situation at hand. Specifically, the Guidelines provide that intended loss is impossible or unlikely "in a government sting operation, or an insurance fraud in which the claim exceeded the insured value." *Id.* These examples indicate that intended loss captures what a defendant *expected* a victim to lose.

Indeed, the First Circuit has stated that "'expected' would be a better term" for intended because "expectation [is] a measure for the defendant's culpability." *U.S. v. McCoy*, 508 F.3d 74, 79 (1st Cir. 2007); citing *United States v. Rostoff*, 53

F.3d 398, 409 (1st Cir. 1995). The *McCoy* court explained that intended loss could be zero "if the defendant sincerely intended and reasonably expected to fully repay the loan." *Id.*; citing *U.S. v. Schneider,* 930 F.2d 555, 559 (7th Cir. 1991).

Intended loss under USSG §2B1.1(b)(1) only applies when defendants expect a victim to lose money because of their crime. *Id.; U.S. v. Appolon* 695 F.3d 44, 69 (1st Cir. 2012); *Schneider,* 930 F.2d at 558-559. For example, the court in *McCoy* held that intended loss in a fraudulent mortgage case should be measured by the defendant's expectation that the defrauded banks would recover less in collateral than they had lent. *See Id.* at 79. In that case, the defendant purchased uninhabitable properties and flipped those properties to low-income buyers based on fraudulent appraisals. *Id.* at 76. When the buyers defaulted, foreclosure generally yielded less money than the banks lent. *Id.* Because the defendant reasonably expected that the banks would lose money, there was intended loss. *Id.* at 79; *see also Appolon*, 695 F.3d at 52-53, 69 (holding that the defendant intended loss in a mortgage fraud scheme because they "could reasonably have anticipated that the properties would be grossly devalued" when they knew that the loans they acquired using overstated purchase prices would default and send the properties into foreclosure).

Alternatively, the Seventh Circuit has held that there is no intended pecuniary loss when the defendants intended to perform a fraudulently obtained

contract. *Schneider*, 930 F.2d at 556-58[3]. In that case, though the defendants made false representations on their applications for building contracts with the government, "there [was] no reason to believe" they would not have performed the contracts if acquired. *Id.* In response, the court explicitly distinguished fraud used to obtain a contract meant to be performed from fraud where an offender "does not intend to perform his undertaking." *Id.* at 558. Accordingly, the court found that no additional points should be awarded under the Guidelines because the defendants were not to "be punished as severely as a con artist who intended to winkle [the relevant amount] from a senile old lady." *Id.* at 559.

Here, Mr. Deng did not "purposefully inflict" loss upon the bank or expect the bank to lose money from the fraudulent mortgage. To undersigned counsel's understanding, the note to the bank remains current. Like the defendants in *Schneider* then, who showed no reason to believe they would not perform a contract that was fraudulently obtained, Mr. Deng has shown no reason to believe he did not intend to fully repay the mortgage loan on the Eddington property. Mr. Deng neither expected to default on the mortgage nor expected that the banks would be at a loss if he were to default. Specifically, even if Mr. Deng were to default, he had no reason to expect that the collateral value of the property would be less than the value of his loan because, unlike the defendants in *McCoy* and *Appolon*, the loan he

[3] As indicated *supra*, *Schneider* was cited by the First Circuit in *McCoy* to support the proposition that intended loss may be zero when a defendant intends to repay a loan. *McCoy*, 508 F.3d at 79. Thus, the case is relevant to an analysis of First Circuit precedent.

received was not greater than the actual value of the property. Thus, though Mr. Deng obtained the mortgage through misrepresentation, he is not culpable of trying to “winkle” any money from the bank because he did not intend for the bank to lose any money.

Ultimately, because there was no actual loss and because Mr. Deng has demonstrated that he intended to repay the mortgage loan, he is not subject to a USSG §2B1.1(b)(1) sentencing enhancement.

B. Mr. Deng Should Receive a “Minor Role” Reduction.

Mr. Deng and Mr. Liang constitute the entire universe of participants whose roles should be considered when conducting a mitigating role analysis for Mr. Deng.

A court may reduce a defendant’s offense level when the defendant is a minor participant in the relevant criminal activity. USSG §3B1.2(b). The first step in analyzing whether a defendant is a minor participant is to “identify the universe of participants involved in the relevant criminal activity.” *United States v. Guía-Sendeme,* 134 F.4th 611, 617 (1st Cir. 2025). The First Circuit follows “a two-step analysis for determining the universe of participants.” *Id.* at 622. “First, sentencing courts must identify ‘the relevant conduct as a whole.’” *Id.* (quoting *United States v. Arias-Mercedes*, 901 F.3d 1, 6 (1st Cir. 2018)). Second, “courts must conduct an ‘invariably “fact-specific” inquiry’ in order ‘to identify the universe of participants involved in the particular context.’” *Id.* (quoting *Arias-Mercedes*, 901 F.3d at 6).

The relevant conduct in a mitigating role analysis is “all conduct within the scope of §1B1.3 (Relevant Conduct).” USSG ch. 3, Pt. B, introductory cmt. The scope

of relevant conduct in "jointly undertaken criminal activity" is determined by "the scope of the criminal activity the particular defendant agreed to jointly undertake." §1B1.3, cmt. n.3(B). This includes "conduct (acts and omissions) of others that was: (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." §1B1.3(a)(1)(B). Critically, "[a]cts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct [in this analysis]" §1B1.3, cmt. n.3(B). Thus, "when evaluating relevant conduct, courts must appraise a defendant's role 'in the specific criminal activity for which he is being held accountable' and not 'in the broader conspiracy.'" *Guía-Sendeme*, 134 F.4th at 621 (quoting *Arias-Mercedes*, 901 F.3d at 6).

Moving to the second step, a "participant" for the purposes of §3B1.2 is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." §3B1.1 cmt. n.1. Critically, however, to be a participant "there must be sufficient evidence of the person's existence and involvement in the crime." *Guía-Sendeme*, 134 F.4th at 617. More specifically, when determining who is a participant, courts should engage in a fact-intensive inquiry and include individuals "only to the extent that they are identifiable or discernable from the evidence." *Arias-Mercedes*, 901 F.3d at 7; quoting *United States v. Rodriguez De Varon*, 175 F.3d 930, 944 (11th Cir. 1999). In other words, courts may not consider

"suppositions woven entirely out of gossamer strands of speculation and surmise." *Id.*

First Circuit precedent demonstrates that the "universe of participants" is limited to identifiable individuals involved in the specific crime for which a defendant is charged. *See Arias-Mercedes*, 901 F.3d at 7 (holding that "'references'[in the record] to unindicted and unidentified persons who had links to the broader criminal organization" were not made with the "sufficient particularity" necessary to include those persons as participants); *Guía-Sendeme*, 134 F.4th at 621-22.

Here, the "universe of participants" must be limited to Mr. Deng and Mr. Liang because the relevant conduct for Mr. Deng's charge (Bank Fraud Conspiracy) is the mortgage fraud associated with the Eddington property and Mr. Deng and Mr. Liang are the only identifiable individuals criminally responsible for that particular charge. First, because the relevant scope of conduct is limited to conduct "within the scope of the defendant's agreement," the court should consider only conduct related to the Eddington property mortgage fraud. The PSR indicates that there is *no* evidence that Mr. Deng "understood the full scope and structure of the criminal activity," that Mr. Deng "participated in substantive planning and/or organizing," or that he "exercised decision-making authority." PSR ¶14A(i)-(iii). Such findings indicate that Mr. Deng had not agreed to participate in the broader conspiracy to defraud mortgages related to multiple properties. Further, the PSR does not allege that Mr. Deng was responsible for acts beyond those related to the

Eddington property mortgage fraud. *See* PSR ¶14A(iv). Thus, the PSR indicates that Mr. Deng is only being held accountable for his role in fraudulently obtaining a mortgage for the Eddington property, and not for the broader conspiracy orchestrated by Mr. Liang. Indeed, the cases against the other two "related co-defendants" (as described in the PSR at p.1), Mr. Chao Zhang and Mr. Siu Shing Wong, do not indicate that Mr. Deng was involved in the fraudulent activities orchestrated by Mr. Liang. Specifically, the prosecution in each Mr. Zhang and Mr. Shing Wong's cases reference only the respective individual charged and "COCONSPIRATOR 1" (Mr. Liang). *See Prosecution Version of the Offense*, *United States v. Zhang*, No. 1:24-cr-00146-SDN-1 (D. Me. Dec. 17, 2024); *Prosecution Version of the Offense*, *United States v. Shing Wong*, No. 1:24-cr-00145-SDN (D. Me. Dec. 17, 2024).

Next, Mr. Deng and Mr. Liang are the only participants criminally responsible for the Eddington property mortgage fraud because they are the only identifiable and discernible people involved in that specific crime. Specifically, neither Mr. Zhang nor Mr. Shing Wong were identified as participating in any activity related to the Eddington property. *See* PSR ¶¶9-10. Additionally, while the PSR references "individual 'renters' who were never named in any of the known federal cases but were often referred to as those who *supposedly* paid rent and sometimes tended to the marijuana grows," *(Id.* at Addendum "Response to Objection No. 2" (emphasis added)) there is no sufficient evidence of the "renters" existence and involvement in the crime to include them as "participants", and they

are not identifiable or discernable from the evidence. Indeed, use of the term "supposedly" demonstrates that the role of the renters is merely speculative supposition. Similarly, though the PSR states that "[t]here were also *likely* individuals that possessed electricity/plumbing knowledge and/or training, who installed the equipment in each home," (*Id.* (emphasis added)), the word "likely" indicates that the role of such individuals is merely speculative and that such individuals are neither identifiable nor discernible.

Ultimately, because Mr. Deng is responsible only for mortgage fraud associated with the Eddington property, and because Mr. Deng and Mr. Liang are the only identifiable individuals involved in that fraud, Mr. Deng and Mr. Liang constitute the entire "universe of participants" for the purpose of a mitigating role analysis in Mr. Deng's sentencing and Mr. Deng should receive a "minor role" adjustment when considered in juxtaposition to Mr. Liang's conduct.

C. Restitution.

Under 18 U.S.C. § 3663, courts shall determine restitution by considering "the amount of the loss sustained by each victim as a result of the offense". 18 U.S.C. § 3663(a)(1)(B)(i)(I). Accordingly, any "restitution ordered must be based on actual loss, not intended or expected loss" and "must be offset by any amount recouped by the victim in question, including resale of the property." *United States v. Innarelli*, 524 F.3d 286, 295 (1st Cir. 2008). In cases of fraud, "actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the

offense." §2B1.1(b)(1)(C)(i). As noted in the PSR, "the Probation Office is not aware of any actual, current loss to Kennebec Savings Bank" and Mr. Deng "has continued to make monthly mortgage payments" on the property. PSR ¶ 15. Because there is no alleged actual loss, there is no basis to order restitution.

However, should the court choose to consider that there *may* be an actual loss in the future, the proper restitution calculation would be based on any losses *after* the bank has sold the collateral property. 18 U.S.C. § 3664(d)(5) states that "[i]f the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." § 3664(d)(5). The Supreme Court has explicitly indicated that courts may read this statute (§ 3664(d)(5)) to postpone determination of restitution in cases where a victim has not yet sold collateral securing a loan, thus avoiding any windfall to the victim. *Robers v. United States*, 572 U.S. 639, 644 (2014) ("Where, for example, a sale of the collateral is foreseen but has not yet taken place, the court may postpone determination of the restitution amount for two to three months after sentencing, thereby providing the victim with additional time to sell."). Accordingly, if the Court orders restitution, it should do so only after the victim bank has sold the collateral property securing Mr. Deng's loan so that the court may ascertain the bank's actual losses.

## *III. Conclusion*

Mr. Deng respectfully urges the Court not to apply the loss enhancement suggested at USSG §2B1.1(b)(1)(F), that it find that Mr. Deng should receive a "minor role" adjustment and, finally, that the Court not order Mr. Deng to pay restitution. In the event the Court agrees with the defense position with respect to these issues then the total offense level is 0 not 12 and, based upon a total offense level of 0 and a criminal history category of I, the guideline imprisonment range would be 0 month to 6 months. Mr. Deng further objected, and continues to object, to a finding that he is ineligible for probation insofar as the statute[4] which expressly precludes probation functionally establishes a *de facto* mandatory, minimum term of imprisonment. However, by engaging in certain acts prior to sentencing, Mr. Deng has made himself amenable to 18 U.S.C. § 3553(e)[5] which permits the "court .... [to] impose a sentence ... without regard to any statutory minimum sentence"

---

[4] Mr. Deng further notes that if the defense's modified guidelines analysis presented herein is adopted then Mr. Deng's case would reside in Zone A of the guidelines which, pursuant to the guidelines, would render the case amenable to a fully probated sentence.

[5] The defense objections to the initial disclosure PSR mistakenly cited to 18 U.S.C. § 3553(f)(1)-(5) for this proposition.

and anticipates arguing for a fully probated sentence (or a time served sentence) at sentencing.

Respectfully submitted,

Dated: July 27, 2026

/s/ James S. Nixon
James S. Nixon, Esquire
Federal Defender
Office of the Federal Defender
23 Water Street, Suite 206
Bangor, Maine 04401
Attorney for Defendant

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No.: 24-CR-140-JAW |
| | : | |
| v. | : | |
| | : | |
| YONGLIANG DENG, a/k/a | : | |
| DAVID DENG | : | |

## CERTIFICATE OF SERVICE

I, James S. Nixon, Esquire, Assistant Federal Defender, Office of the Federal Defender, attorney for the Defendant, hereby certify that on July 27, 2026, I electronically filed the Defendant's Memorandum in Aid of Sentencing with the Court via the CM/ECF electronic filing system which will send notification of such filing via said system electronically on the 27th day of July, 2026 to the following persons:

Alisa Ross, Assistant U.S. Attorney
U.S. DEPARTMENT OF JUSTICE
202 Harlow Street, Rm 111
Bangor, Maine 04401
Alisa.Ross@usdoj.gov

Dated: July 27, 2026

/s/ James S. Nixon
James S. Nixon, Esquire
Federal Defender
Office of the Federal Defender
23 Water Street, Suite 206
Bangor, Maine 04401
Attorney for Defendant